# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

————————————————————— )
)
BELL HELICOPTER TEXTRON INC., )
*et al.*, )
)
Plaintiffs, )
)
v. )          Civil Action No. 06-1694 (ABJ)
)
ISLAMIC REPUBLIC OF IRAN, *et al.*, )
)
Defendants. )
—————————————————————)

## MEMORANDUM OPINION

This action involves a motion by defendant Islamic Republic of Iran ("Iran") under Federal Rules of Civil Procedure 60(b)(1), (4), and (6) to vacate a default judgment entered against it  for a violation of the Lanham Act, 15 U.S.C. § 1125 (2006).  Because the Court finds that defendant Iran has not waived sovereign immunity, it will grant its motion to vacate the default judgment pursuant to Rule 60(b)(4) [Dkt. #28] and dismiss the action for lack of subject-matter jurisdiction.[1]

## I.  BACKGROUND

On September 29, 2006, plaintiffs Bell Helicopter Textron Inc. ("Bell") and Bell Helicopter Textron Canada Ltd. ("Bell Canada") filed a complaint in this Court against defendants Iran, Iran Aircraft Manufacturing Company ("HESA"), and Iran Helicopter Support & Renewal Company ("PANHA"), alleging trademark violations under the Lanham Act. Compl. [Dkt. # 1] ¶ 4.2.  Defendants failed to appear, and on March 31, 2009, the Clerk of the Court found them to be in default.  [Dkt. # 11].  On October 5, 2009, the Court then assigned to

---

1       Because the Court finds that it does not have subject-matter jurisdiction over this action, it will not address defendant's other Rule 60(b) grounds to vacate.

the matter conducted an evidentiary hearing pursuant to the Foreign Sovereign Immunities Act ("FSIA") to determine whether plaintiffs had "establishe[d] [their] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e) (2006). [Dkt. # 28-2]. After concluding that plaintiffs had adequately established their claim for relief, the Court issued Findings of Fact and Conclusions of Law ("Findings of Fact") [Dkt. # 17] and entered a default judgment against defendant Iran in the amount of $22,532,127.28 on February 11, 2011. Order and Judgment [Dkt. # 18].[2]

The evidentiary hearing focused on the merits of plaintiffs' claims; plaintiffs submitted evidence regarding trademark infringement, dilution, and tarnishment, as well as the amount of the damages. Transcript of Hearing ("Tr.") [Dkt. # 28-2] at 3–4. The hearing did not specifically address whether the Court had subject matter jurisdiction to hear the case. *Id*. But the Findings of Fact contained the conclusion that jurisdiction was established because defendant had waived its sovereign immunity under the FSIA since "plaintiffs have demonstrated both that Iran engaged in commercial activity outside of the United States and that the commercial activity caused a direct effect in the United States." Findings of Fact at 5.

Evidence presented at the hearing demonstrated that since 2001, defendant had been manufacturing helicopters that copied the distinctive trade dress of plaintiffs' "Bell 206." Tr. at 18; Findings of Fact at 3 ¶¶ 9–11, 15. The defendant's aircraft, known as the "Shahed 278," and the militarized version, the "Shahed 285," were marketed to foreign customers at an air show on an island off the coast of Iran and were advertised in international aviation magazines. Tr. at 18. The witnesses presented expressed the belief that international customers might purchase

---

2       Judgment was only sought and granted against defendant Iran, not defendants HESA or ANHA. Order and Judgment, Feb. 11, 2011. Accordingly, only defendant Iran has moved to vacate the default judgment.

defendant's helicopters thinking that they were actually Bell helicopters and expecting performance similar to that of a Bell helicopter.  Tr. at 42, 48.  Finding that plaintiffs' customers were likely to be confused as to the source or origin of the products sold by defendant, *id.* at 8, the Court awarded plaintiffs treble damages of $19.5 million, $2.5 million in pre-judgment interest, and nearly $500,000 in attorney's fees.  Findings of Fact at 3, 9; Order of Default Judgment [Dkt. # 18].

Defendant received notice of the default judgment [Dkt. # 20] on August 17, 2011.  On February 10, 2012, it filed a motion to vacate the judgment pursuant to Federal Rules of Civil Procedure 60(b)(1), (4), and (6) on the grounds that the court lacked subject matter jurisdiction. Def.'s Mem. in Supp. of Mot. to Vacate Default J. ("Def.'s Mem.") [Dkt. # 28] at 2–3, 10.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 60(b) permits a court to relieve a party from a judgment or order for any one of six reasons:  (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation, or other misconduct by an opposing party; (4) a void judgment; (5) a satisfied, released, or discharged judgment; or (6) any other reason justifying relief.  Fed. R. Civ. P. 60(b).  A motion to vacate on one of the first three grounds must be made within one year, and all motions must be made "within a reasonable time."  Fed. R. Civ. P. 60(c)(1).  "The party seeking relief from judgment bears the burden of proof."  *Norris v. Salazar*, 277 F.R.D. 22, 25 (D.D.C. 2011).

Rule 60(b)(4) applies if a judgment is void, a judgment is considered to be void "if the court lacked . . . subject-matter jurisdiction in the case."  *Ramirez v. Dep't of Justice*, 680 F. Supp. 2d 208, 210 (D.D.C. 2010).   "[I]f the judgment is void, relief is mandatory."  *Combs v. Nick Garin Trucking*, 825 F.2d 437, 441 (D.C. Cir. 1987).

A court lacks subject-matter jurisdiction over a foreign state "except as provided . . . by nine specifically enumerated exceptions . . . . If no exception applies, a foreign sovereign's immunity under the FSIA is complete:  the district court lacks subject matter jurisdiction over the plaintiff's case." *Phoenix Consulting Inc. v. Republic of Angl.*, 216 F.3d 36, 39 (D.C. Cir. 2000).

## III.  ANALYSIS

### A.  Because jurisdiction has never been litigated, the Court must conduct its own *de novo* analysis of the jurisdictional question.

The Supreme Court has explained that a judgment is void under Rule 60(b)(4) if the court that entered it lacked jurisdiction over the case. *United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1367, 1377 (2010).   However, "[a] judgment is not void . . . simply because it is or may have been erroneous." *Espinosa*, 130 S. Ct. at 1377 (internal citation omitted).  Nor is a motion under Rule 60(b)(4) a substitute for a timely appeal.  *Id.*  "Instead, Rule 60(b)(4) applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." *Id.*, citing *United States v. Boch Oldsmobile, Inc.*, 909 F.2d 657, 661 (1st Cir. 1990).[3]

---

3      Plaintiffs have argued that defendant's motion under Rule 60(b)(4) is untimely.  Pls.' Mem. in Opp. to Def.'s Mot. to Vacate Default J. ("Pls.' Opp.") [Dkt. # 32] at 3 n.3.  Although plaintiffs cite cases that held that Rule 60(b)(4) motions are generally considered to be untimely if they are filed three months after judgment, those cases involved grounds other than subject-matter jurisdiction.  *Id.*, citing *e.g., Brannum v. Buriltanu*, No. Civ. A. 96-302, 1999 WL 680007, at *1–2 (D.D.C. July 28, 1999) (finding that the plaintiff's motion for relief from judgment was untimely after failing to respond to defendant's motion to dismiss after four months).  But a Rule 60(b)(4) motion attacking a default judgment for lack of subject-matter jurisdiction can be brought regardless of the amount of time that has passed, even if the motion is brought more than a year after the entry of judgment. *See Practical Concepts v. Republic of Bol.*, 811 F.2d 1543, 1545 (D.C. Cir. 1987) (ruling that the district court was correct to consider the merits of Bolivia's Rule 60(b)(4) motion more than a year after the entry of judgment); *Von Dardel v. Union of Soviet Socialist Republics*, 736 F. Supp. 1, 8 (D.D.C. 1990) (granting the Soviet Union's motion to vacate default judgment for lack of subject-matter jurisdiction more than three years after entry of default judgment).

4

Here, defendant contends that the judgment is void because the Court lacked subject matter jurisdiction to enter it.  Def.'s Mem. at 2.  And the law is clear that "every federal court has a 'special obligation to satisfy itself' of its own jurisdiction before addressing the merits of any dispute." *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012), quoting *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986).

Plaintiffs respond that a defendant cannot obtain relief from a default judgment for lack of jurisdiction unless "the court that rendered judgment lacked *even an 'arguable basis'* for jurisdiction." Pl.'s Opp. at 4, citing *Espinosa*, 130 S. Ct. at 1377.  Plaintiffs direct the Court to the following passage from *Espinosa*:

> Federal courts considering Rule 60(b)(4) motions that assert a judgment is void because of a jurisdictional defect generally have reserved relief only for the exceptional case in which the court that rendered judgment lacked even an "arguable basis" for jurisdiction. *Nemaizer v. Baker*, 793 F.2d 58, 65 (2d Cir. 1986); *see, e.g., Boch Oldsmobile, supra*, at 661–662 ("[T]otal want of jurisdiction must be distinguished from an error in the exercise of jurisdiction, and . . . only rare instances of a clear usurpation of power will render a judgment void . . . .").

130 S. Ct. at 1377.  But plaintiffs' argument mischaracterizes what the Supreme Court actually said in *Espinosa*.  The Court did not hold that the test should be simply whether there was any arguable basis for jurisdiction, or that in reviewing a judgment under Rule 60(b)(4), a district court is limited only to those circumstances where there has been a clear usurpation of power.  In fact, the Court expressly declined to address that question in the paragraph immediately following the quote provided by plaintiffs:

> This case presents no occasion to engage in such an "arguable basis" inquiry or to define the precise circumstances in which a jurisdictional error will render a judgment void because [defendant] does not argue that [the court's] error was jurisdictional.

*Id*.

The Third Circuit recently grappled with what *Espinosa* might mean in *Aurum Asset Managers, LLC v. Bradesco Companhia de Seguros*, 441 Fed. App'x 822, 824–25 (3d Cir. 2011).   In that case, a Brazilian-owned company moved to vacate a judgment enforcing an arbitration award against it.   *Id.* at 823.   As in this case, the motion to vacate was filed in the district court almost a year after the original order was entered.   *Id.* at 823–24; *Aurum Asset Managers, LLC v. Banco Do Estado Do Rio Grande Do Sul*, Misc. No. 08-102, 2010 WL 4027382, at *1 (E.D. Pa. 2010).   The district court ruling on the motion considered the question of jurisdiction *de novo* and vacated the order on the grounds that the court lacked jurisdiction under the FSIA to confirm the arbitration award and enter judgment in the first place.   *Aurum*, 2010 WL 4027382, at *7.

On appeal, the Third Circuit took note of the Supreme Court's observation in *Espinosa* that Rule 60(b)(4) had generally been applied "only in the 'rare instance' that there is a jurisdictional error," and that the jurisdictional error must involve a "clear usurpation of power." *Aurum*, 441 Fed. App'x at 824 (internal citation omitted).   But the court noted that it was also compelled to follow certain well-established principles of federal jurisdiction.   First, the court observed that "jurisdiction is a fundamental pre-requisite to the exercise of judicial power."   *Id.*, citing *Ex Parte McCardle*, 74 U.S. 506, 514 (1869) ("Without jurisdiction the court cannot proceed at all in any cause.").   Second, the court noted that a defendant is "always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding."   *Id.*, quoting *Budget Blinds, Inc. v. White*, 536 F.3d 244, 259 (3d Cir. 2008).

This principle is binding in the D.C. Circuit as well.   *See Practical Concepts*, 811 F.2d at 1547 ("[T]he defendant may refrain from appearing, thereby exposing himself to the risk of a

default judgment.  When enforcement of the default judgment is attempted, however, he may assert his jurisdictional objection.  If he prevails on the objection, the default judgment will be vacated.").

The *Aurum* court then reconciled these two principles by articulating a rule that "the 'clear usurpation standard' for vacating an order . . . only applies in circumstances in which the parties have had their day in court on the issue of jurisdiction such that re-litigation of the issue is barred by principles of *res judicata*." *Aurum*, 441 Fed. App'x at 825 (internal citation omitted) (italicization added).[4]  Ultimately, the court found that the parties in the case before it had not had an opportunity "to fully and fairly litigate the issue of subject matter jurisdiction," which were "prerequisites to *res judicata*." *Aurum*, 441 Fed. App'x at 825 (internal citations omitted) (italicization added).[5]  Because the original determination that jurisdiction existed was made in

---

[4]    The court distinguished those cases where jurisdiction had already been fully litigated at the outset. *Aurum*, 441 Fed. App'x at 825 (finding that there was no clear usurpation of authority because "the parties had appeared and litigated the issue of jurisdiction"), citing *Marshall v. Bd. of Educ.,* 575 F.2d 417, 422 (3d Cir. 1978); *United States v. Tittjung*, 235 F.3d 330, 342 (7th Cir. 2000); *Nemaizer v. Baker*, 793 F.2 58, 64 (2d Cir. 1986) (same).

[5]    Plaintiffs cite a number of cases in which they claim that courts applied the *Espinosa* standard to a Rule 60(b)(4) motion where jurisdiction had not previously been litigated.   Pls.' Supp. Mem. [Dkt. # 35] at 2–6.  None of those cases are controlling precedent on this Court.  Moreover, the majority of the cases address different factual circumstances than this case because, as defendant points out, "the party seeking Rule 60(b) relief in those cases had previously participated in the litigation that led to the judgment against it, as in *Espinosa* itself." Def.'s Opp. to Pls.' Supp. Mem. at 1–4, *citing, e.g.*, *U.S. v. Zimmerman*, No. 11-4604, 2012 WL 3264876, at *3 (3d Cir. Aug. 13, 2012) ("[A]fter appearing in the case, admitting that the District Court had jurisdiction, allowing the District Court to enter final judgment against them, and failing to take a direct appeal of that final judgment, the District Court's exercise of subject matter jurisdiction is *res judicata*.") (italicization added).  Only two of the ten cases cited by plaintiffs address a situation similar to this case, where defendant never appeared and jurisdiction had not originally been litigated.   *In re Bryan*, 429 B.R. 1, 4 (Bankr. D. Colo. 2010); *U.S. v. Billion Int'l Trading, Inc.*, No. 11-cv-2753-WSD, 2012 WL 1156356, at *1 (N.D. Ga. Apr. 5, 2012).  Because this Circuit has not adopted that approach, and the Third Circuit's analysis is more consistent with the clear limits on federal jurisdiction, the Court declines to follow them.

error, the circuit affirmed the district court's conclusion that the order confirming the arbitration award should be vacated for lack of subject matter jurisdiction.

This Court finds the analysis set forth by the Third Circuit to be persuasive and consistent with the clear directives in this Circuit on the question of subject matter jurisdiction. Therefore, the threshold issue this Court must resolve is whether the jurisdictional question in this case has been fully and fairly litigated. Reviewing the record in this case, the Court cannot conclude that it has. Defendant did not participate at all in the proceedings and so the question was never put directly to the court to resolve. There was a clerk's entry of default [Dkt. # 11] and the trial court ordered that a hearing be held – but this hearing concerned the issue of damages only.[6] Minute Order, July 23, 2009 ("Upon consideration of the default that was entered against defendant the Islamic Republic of Iran on March 31, 2009, it is hereby ORDERED that a hearing on damages is scheduled for September 15, 2009, at 12:30 p.m."). At that hearing, plaintiffs submitted exhibits, witnesses, and a trial brief, and the Court made Findings of Fact and Conclusions of Law, but those were for the purpose of determining the amount of the default judgment. Minute Entry, Oct. 05, 2009. Although the Court made a summary finding that defendant was engaged in commercial activity that caused a direct effect in the United States, Findings of Fact [Dkt. # 17] at 5, that finding was not the subject of any sort of adversary process, and the Court did not elaborate upon the reasoning behind that conclusion. Since the matter has not been previously litigated, and certainly not "fully and fairly," the Court will conduct a *de novo* review to determine whether it has subject-matter jurisdiction.

---

6       Although the hearing was docketed as a "damages hearing," the transcript of the proceeding indicates that plaintiffs also presented evidence to support the evidentiary basis for plaintiffs' claim that a trademark violation took place. Tr. at 3.

**B.  Iran did not waive its sovereign immunity under the FSIA.**

Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of the United States courts," and "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see* 28 U.S.C. § 1605 (2006). These exceptions provide "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Nelson*, 507 U.S. at 355, quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989) (internal quotation marks omitted). In other words, the strong presumption under the FSIA is that there is no jurisdiction over foreign sovereigns, and American courts cannot hear a case brought against them *unless* one of the exceptions applies – even in situations where the wrongfulness of the foreign sovereign's conduct is clear and indisputable.[7] Plaintiffs contend that the relevant exception here is the commercial activity exception, which provides for jurisdiction in cases "in which the action is based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

1.  <u>What constitutes a "direct effect" under the FSIA?</u>

While the record supports – and neither party disputes – the finding that Iran engaged in "commercial activity" in this instance, the question of whether that activity had a "direct effect in the United States" is more difficult. Essentially, plaintiffs argue that this Court can exercise jurisdiction because defendant's conduct had an effect in the United States. *See* Pls.' Opp. at 5–

---

7       Because the FSIA presumes the absence of jurisdiction, plaintiffs' many citations to personal jurisdiction cases and FSIA cases that simply recite personal jurisdiction cases are not germane. Under state long arm statutes, the presumption tends to be just the opposite: that there *will* be jurisdiction unless it offends due process. *See, e.g., CYBERsitter v. China*, 805 F. Supp. 2d 958, 966–967 (C.D. Cal. 2011) (discussing personal jurisdiction test).

7.  But that is not the relevant inquiry.  The record must establish that the conduct had a "direct" effect before the presumption of sovereign immunity can be overcome.

The Supreme Court has instructed that for FSIA purposes, a direct effect "follows as an *immediate* consequence of the defendant's activity."  *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (emphasis added) (internal citation and quotation marks omitted).  The FSIA does not permit jurisdiction over foreign sovereigns when the complained of effects are attenuated, remote, or speculative.  *Id*. at 618.

A direct effect "has no intervening element, but, rather, flows in a straight line without deviation or interruption."  *Upton v. Empire of Iran*, 459 F. Supp. 264, 266 (D.D.C. 1978), aff'd 607 F.2d 494 (D.C. Cir. 1979); *Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 24 (D.D.C. 2000) (internal citation and quotation marks omitted), quoting *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994).  Thus, as the D.C. Circuit explained in *Princz*, and another court in this district reiterated in *Bao Ge*, an effect is not direct if "many events and actors necessarily intervened" between the act perpetrated overseas and the impact felt here.  *Princz*, 26 F.3d 1172; *Bao Ge*, 201 F. Supp. 2d at 24.

Following that reasoning, in *Virtual Countries, Inc. v. Republic of S. Afr.*, 300 F.3d 230, 238 (2d Cir. 2002), the Second Circuit determined that a press release issued by the Republic of South Africa did not have a direct effect in the United States because "the press release's effect falls at the end of a long chain of causation and is mediated by numerous actions by third parties."  *Id*. at 237.  The court found that because, at a minimum, two different groups of independent actors – first, the press and second, investors, potential investors, and business partners – were required to intervene "between the issuance of the press release and any alleged injurious effect on the plaintiff," there was no direct effect in the United States.  *Id.*  "The press

release's effect thus depended crucially on variables independent of the Republic.  This tangled causal web does not provide the requisite immediacy to establish jurisdiction."  *Id.* at 237–38, citing *Weltover*, *Inc.,* 504 U.S. at 618.

Moreover, according to the D.C. Circuit, a direct effect requires that "something legally significant actually happened in the United States."  *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir. 1988); *see also Gregorian v. Izvestia*, 871 F.2d 1515, 1527 (D.C. Cir. 1989).  In *Zedan,* the court explained that in cases where it has found direct effects, "the foreign sovereign caused a 'substantial' and 'direct and foreseeable' effect in the United States."  *Zedan*, 871 F.2d at 1515 (internal citation omitted).[8]  And therefore, courts have concluded that "[a] financial loss in the United States, when all the acts giving rise to the claim occur outside this country, is insufficient to show the 'direct effect' in the United States that FSIA requires." *BPA Int'l, Inc. v. Kingdom of Swed.*, 281 F. Supp. 2d 73, 81 (D.D.C. 2003); *see also Ge v. Peng*, 201 F. Supp. 2d 14, 24–25 (D.D.C. 2000).

2.  Plaintiffs' theories of "direct effect"

At the outset, the Court notes that all of defendant's actions took place outside of the United States.  Defendant manufactured the helicopters in a plant in Iran, Tr. at 12, and it promoted the helicopters at an international air show that is held in Iran, which is attended by international customers.  Findings of Fact at 3 ¶ 15.  While plaintiffs expressed concern at the hearing that defendant would sell its helicopters to other foreign countries, Tr. at 36, 44, 46, 48,

---

8        *See also Samco Global Arms, Inc. v. Arita*, 395 F.3d 1212, 1217 (11th Cir. 2005) (finding that alleged injuries were too indirect and speculative to constitute direct effects); *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994) ("Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States.").

they cannot be sold in the United States because they do not meet American certification requirements.  *Id.* at 45, 55.

Thus, plaintiffs do not even attempt to argue that any act of legal significance happened in the United States.  Instead, their claimed direct effects boil down to potential financial and reputational loss.  They argue that there are four reasons why the record supports a finding of "direct effects" in the United States:  (1) infringement of intellectual property owned by a U.S. company causes "direct effects" in the United States; (2) their argument is grounded in "basic economic logic;" (3) the financial loss by plaintiffs was so significant to rise to the level of direct effects; and (4) defendant's counterfeiting caused confusion within the United States.  Pls.' Opp. at 5–6.  Defendant contends that as in *Virtual Countries,* this case lacks the necessary direct effect because plaintiffs' alleged injury "depends on middlemen – that is, depends on consumers outside the United States confusing [defendant's] products with [p]laintiffs' products, and therefore electing not to purchase a Bell helicopter."  Def.'s Mem. at 5. [9]

The Court will address argument each in turn.

a. *The infringement of intellectual property owned by a United States company does not necessarily cause a "direct effect" in the United States.*

Plaintiffs contend that for purposes of trademark infringement, the location of the harm is the location of the harmed company, and the fact of the trade dress infringement alone constitutes a "direct effect" in the United States, and therefore, a waiver of sovereign immunity,

---

[9]     Plaintiffs claim that it is up to defendant to demonstrate that none of these arguments provides "an arguable basis" for jurisdiction under *Espinosa*, *id.* at 7, but as explained above, that is not the proper legal standard.

as a matter of law.  *Id.* at 5–6.[10]  In support of this argument, plaintiffs point to only one case

involving the FSIA, *CYBERsitter*, 805 F. Supp. 2d at 977, which is not binding on this Court.

In *CYBERsitter,* a district court in California held that the misappropriation of

copyrighted computer code and its resale in China by Chinese-owned companies had a "direct

effect" in the United States because the owner of the code was located in the United States.  805

F. Supp. 2d at 976–77.  Therefore, the court found that China had waived its sovereign immunity

through the commercial activity exception of the FSIA.  *Id.*[11]  Here, because defendant allegedly

misappropriated a trademark belonging to an American company, plaintiffs claim that there was

a "direct effect" in the United States and that Iran's sovereign immunity has been waived.

But *CYBERsitter* provides little guidance because the opinion does not explain the

reasoning behind the conclusion that there was a direct effect in the United States.  The court

simply states:  "[b]ecause the locus of that injury occurred at Plaintiff's principal place of

---

10     Defendant submits that this is too remote, and that for confusion to be a direct effect, the international consumers would themselves need to be confused, come to America, and pass that confusion along to the point that Bell's sales would decline more than a trivial amount.  Def.'s Mem. at 4–5.

11     Bell cites other cases supporting the proposition that the harm caused by copyright or trademark infringement is inflicted at the location of the injured company, but *CYBERsitter* is its most relevant supporting case.  The other cases were used to establish personal jurisdiction over the defendants, not subject-matter jurisdiction, and they did not involve the FSIA.  *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 640 F.3d 497, 500–01 (2d Cir. 2011) (holding that the district court had personal jurisdiction over the defendant when the site of a copyright owner's alleged injury is the location of the copyright owner); *McGraw-Hill Cos. v. Ingenium Techs. Corp.*, 375 F. Supp. 2d 252, 256 (S.D.N.Y. 2005) (holding that because "trademark infringement cause[s] injury in the state where the allegedly infringed intellectual property is held," the court had personal jurisdiction over the infringing party).  One case cited by Bell, and the only one from this district, actually cuts against Bell's argument.  *Nu Image, Inc. v. Does 1–23,322*, 799 F. Supp. 2d 34, 39 (D.D.C. 2011) ("[T]he District of Columbia Circuit has held that economic injury does not necessarily occur where the plaintiff is domiciled, but rather that the site of the injury is the location of the original events that caused the alleged injury.") (internal citation and quotation marks omitted).

business in California, the PRC's actions had a direct effect in the United States." *Id.* at 977, citing *Panavision Int'l v. Toeppen*, 141 F.3d 1316, 1322 n.2 (9th Cir. 1998). But *Panavision* is a personal jurisdiction case that simply says that a corporation has been injured where its headquarters are located, so the case does not the address question that is before this Court. *Panavision*, 141 F.3d at 1322 n.2. Moreover, the district court's conclusion in *CYBERsitter* – that a Lanham Act violation constitutes a direct effect for FSIA purposes – does not grapple with the different presumptions involved in a personal jurisdiction analysis and waiver of sovereign immunity analysis under the FSIA. Most important, the conclusion does not comport with the law in this Circuit or the Supreme Court precedent about the requirements of a direct effect, namely, that conduct that requires the participation of a series of actors and events before the harm can be felt, cannot constitute a direct effect.

*CYBERsitter* also can be distinguished factually from the present situation because, in that case, the infringing company made the software available for download to individuals in the United States over the worldwide web. *CYBERsitter*, 805 F. Supp. 2d at 968. Here, it has not been shown that the infringing aircraft were marketed in the United States. Tr. at 44 ("Q: [C]an you think of any reason why the Islamic Republic of Iran would adopt Bell's trade dress in the design of their own helicopter? A: The only reason I could think of and the obvious reason would be to introduce it into a Third World market."). Indeed, defendant's helicopters could not be sold in America at all since they did not meet the strict certification requirements. *Id*.

      b.   *"Economic logic" also does not establish a direct effect.*

Plaintiffs next contend that "courts routinely accept arguments grounded in 'basic economic logic'" and that "the general rule in economics is that price decreases with increasing supply." Pls.' Opp. at 5 (internal citation omitted). According to plaintiffs, because the supply

of helicopters and parts bearing plaintiffs' trade dress has increased in the worldwide market, plaintiffs' inventory and intellectual property in the United States have been devalued.  *Id.* at 5–6.  While it may be true that courts "routinely accept" economically logical arguments in other contexts, none of the cases cited by plaintiffs involve the FSIA.  *Id.*, citing *Citizens for Envtl. Quality v. United States*, 731 F. Supp. 970, 993–94 (D. Colo. 1989) (involving the National Forest Management Act) and *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993) (alleging unconstitutional enforcement of a Massachusetts milk pricing order).  So while there is precedent to support the unremarkable proposition that courts may accept arguments that rely on basic "economic logic" to support a finding of harm, that precedent does not go so far as to overturn the presumption of sovereign immunity.  Even if the Court were to adopt plaintiffs' explanation of how they were harmed because it is economically sound, that would only get plaintiffs as far as establishing that financial losses occurred, which, the D.C. Circuit has been clear, does not in and of itself constitute a direct effect in the United States.

        c.  *Bell's financial losses do not constitute a "direct effect."*

Since financial injury alone will not suffice, plaintiffs offer up the theory that because the financial effect of Iran's alleged counterfeiting was so large, it should be considered a *per se* "direct effect."  Pls.' Opp. at 6.  There is no case that stands for this proposition.

The court found that Bell was due $19.5 million in treble damages as a result of Iran's counterfeiting.  Findings of Fact at 9.  But this is a purely financial loss, and there is no dispute that "mere financial loss due to commercial activity abroad is not, in itself, sufficient to form a "direct effect."  *Millicom Int'l Cellular v. Republic of Costa Rica*, 995 F. Supp. 14, 22 (D.D.C. 1998) (internal citation omitted).  Plaintiffs claim that this case involves more than just financial loss, because defendant "specifically targeted trade dress registered with the U.S Patent and

Trademark Office, and owned by a United States corporation." Pl.'s Opp. at 6 (internal citations omitted). But the case plaintiffs rely on to support the proposition that courts are willing to characterize effects as "direct" when they are deliberate is distinguishable. *Id.*, citing *Virtual Def. & Dev. Int'l, Inc. v. Republic of Mold.* 133 F. Supp. 2d 1, 7 (D.D.C. 1999). In that case, the court found a direct effect because the complaint alleged a breach of contract and payments were to be made in the United States. *Virtual Def. & Dev. Int'l, Inc.*, 133 F. Supp. 2d at 7. Also, there was another independent exception under the FSIA that applied because the foreign country's agents were operating in the United States. *Id.* Neither of those considerations is present in this case. The other case cited by plaintiffs, *Gilson v. Republic of Ir.*, 682 F.2d 1022 (D.C. Cir. 1982), includes language discussing the legislative purpose underlying the FSIA that arguably supports plaintiffs' argument, but it does not hold that significant financial consequences can supply the necessary direct effects. *Id.* at 1028. Indeed, the D.C. Circuit expressly stated: "[w]e are not making a final factual determination of whether jurisdiction exists." *Id.* at 1026.

While it is true that a court can find a direct effect in the United States if a party demonstrates there have been other effects in addition to financial harm, nothing in the record supports that finding here. In *McKesson HBOC, Inc. v. Islamic Republic of Iran*, the D.C. Circuit held that Iran's expropriation of an American corporation's minority interest in a company constituted a "direct effect" in the United States. 271 F.3d 1101, 1105 (D.C. Cir. 2001), *vacated in part on other grounds*. In *McKesson*, the court stated that although the loss of dividends alone was not enough to find a "direct effect" in the United States, there was also "the cut-off of the constant flow of capital, management personnel, engineering data, machinery, equipment, materials, and packaging" between the American and Iranian companies as well as the "abrupt end of McKesson's role as an active investor [in the foreign company]" that

supported a finding of direct effects.  *Id.*  (internal citations and quotation marks omitted).  In this case, nothing in the record from the evidentiary hearing suggests that plaintiffs remain involved in Iran, that there were any contractual obligations due in the United States, or that there was any back-and-forth transmittal of materials, persons, capital, or ideas.  Plaintiffs' involvement in Iran ended in 1979, at the time of the Iranian Revolution, Tr. at 11,[12] so the only harm to the company in the United States is financial loss.

> d.  *Plaintiffs' claim that consumers were confused by Iran's conduct does not establish a "direct effect".*

Finally, plaintiffs argue that consumers in America have been confused by defendant's production of helicopters with plaintiffs' trade dress.  They direct the Court to testimony from a domestic helicopter customer who said he "basically thought that Bell was allowing someone else a license to build their aircraft" when he was first shown the pictures of Iranian copies.  *Id.* at 42.  However, the witness testified that once he read the caption underneath the picture, he was no longer confused as to the source of the helicopter's origin.  *Id.*  It is true that the witness did go on to opine that other consumers would believe the Shaheed 278 to be a Bell product, *id.,* but he made it clear that defendant's helicopters would not be able to meet American or European certification requirements so they could not enter the domestic stream of commerce.  *Id.* at 44.

At most, this testimony establishes that defendant's conduct had an "effect" in the United States, but it does not, as plaintiffs claim, establish that the effect was direct as that term has been defined by the courts.  Thus, the four theories advanced by plaintiffs are not sufficient to overcome the presumption of sovereign immunity in this case.

> 3.  <u>The record before the Court does not establish a direct effect.</u>

---

12      The record shows plaintiffs had a factory in Iran to manufacture helicopters for the Iranian government.  Tr. at 12.  After the Iranian Revolution, plaintiffs abandoned the factory and it is now being used by defendant to manufacture its helicopters.  *Id.*

Neither party focused extensively on the concept of directness in its pleadings, and neither undertook a close examination of the record with those legal principles in mind.  So, the the Court conducted its own review of the transcript from the evidentiary hearing [Dkt. # 28-3], and it concludes that there is no record evidence of any acts – much less legally significant acts – occurring in the United States.  Furthermore, the record reveals that all of the effects plaintiffs claim they could or did experience are dependent upon the actions of third parties and a chain of intervening events.  Thus, the evidence is insufficient to establish the direct effect required to remove the protection of sovereign immunity.

The following evidence was introduced at the hearing:

Plaintiffs' first witness was David Chant, an attorney who represented plaintiffs in Texas. He testified that defendant had been displaying its helicopter prototype at an air show on an island of Iran where an international air show is held each year.  Tr. at 18.  He also testified that as of 2007, defendant had built at least five of the infringing helicopters, Shahed 278s.  *Id.* at 21.

The next witness was Mahmoud Katirai, an Iranian attorney, who testified that the Shahed 285 and Shahed 278 (the militarized version of the Shahed 285) were in production in Isfahan, Iran at the time of his testimony.  *Id.* at 24.

Douglas Jordan, an engineer for Bell Helicopter, testified about the uniqueness and longstanding use of Bell's trade dress in over 10,000 helicopters.  *Id.* at 30–31, 34.  He explained that the trade dress is not functional, but it is a cosmetic, marketing feature that identifies helicopters as being manufactured by Bell.  *Id.* at 30–31, 33.

Mr. Jordan also testified about Bell's customers:

Q:    [W]ho are Bell's primary customers, Mr. Jordan?

A:    We have both military and commercial customers; United States military, as well as foreign military, but we also have numerous commercial customers.

Q:    So we – it is fair to say that Bell sells to – militarized versions of the 206 model series helicopters to foreign governments?

A:    That is correct.

Tr. at 36.

This is the testimony plaintiffs cite when they assert in their briefs that there is one "world-wide market" for Bell Helicopters.  Pls.' Opp. at 6; *see also* Pls.' Supp. Mem. at 1.

Plaintiffs' next witness was Vernon Albert, an independent aviation safety consultant. He was the former vice president of Petroleum Helicopters Incorporated (a world-wide commercial helicopter operator), and former chair of an international trade association of helicopter operators and manufacturers.  *Id.* at 37–39.  He testified to the marked similarity of the defendant's product, noting that when he was shown a picture of the allegedly counterfeit helicopter, he "basically thought that Bell was allowing someone else a license to build their aircraft."  *Id.* at 41–42.  He continued:

Q:    What made you think that was a Bell product or Bell licensed product?

A:    Just the general profile, the appearance of the aircraft, basically, says Bell all over it.

Q:    What specifically about that picture and design do you associate with Bell?

A:    Well, the – just starting at the front of the aircraft and working back, the nose, windshield, and door profile, the cockpit area, is basically the same.  When you look at the rotor head, the control rods, the upper engine cowling, and the way the tailpipes come out of the cowling and everything, they are identical.

Q:    So is it fair to say that [with] your experience as a pilot and executive in the helicopter industry, you believed that a helicopter depicted in [Exhibit] 6(h) was indeed a Bell product?

A:    Until I read the caption on it, yes, sir.

Q:    Okay. Do you think other consumers in similarly situated as you . . . would believe that what I represent to you as the Shahed 278 is a Bell product?

19

A:       Oh, absolutely.

*Id.* at 42.

Based on this testimony, the Court found that someone looking at the defendant's aircraft would think it was a Bell product.  Findings of Fact at 3.  But the testimony also suggests that receiving a modest amount of additional information, such as reading the caption under a picture, could clear up the confusion.  In any event, even if the Court ignored the possibility that proper labeling would clarify any confusion about the true manufacturer of the helicopter, this testimony establishes only the potential confusion – the first link in the chain.  More is needed before the harm is felt in the United States.

Albert also testified that by the mid to late 1980s, Bell's products "had accumulated a safety record that was second to none" and that "[i]t's a large tool in aviation when you can market safety."  *Id.* at 43.  In other words, the testimony indicated that Bell's reputation for safety had economic value.  Albert went on:

Q:       [C]an you think of any reason why the Islamic Republic of Iran would adopt Bell's trade dress in the design of [its] own helicopter?

A:       The only reason I could think of and the obvious reason would be to introduce it into a Third World market. The – a lot of the development in our industry today is going into Central and South America and the African continent . . . . An aircraft such as this could be marketed in those areas because they don't have to go through the certification process and everything that U.S. manufacturers do.  The European manufacturers and U.S. manufacturers all go through a very stringent certification process.

I run into this all over the world when I am doing my safety audits.  The Eastern Block countries made good aircraft, but they didn't meet the safety and certification standards . . . to be certified in North America and Europe. Consequently, you don't see that type of aircraft operating in North America and Europe, but you do see them operating in Bolivia, Peru, the South African countries where a lot of development and growth is going on right now because they can be marketed less expensively, and they are readily available, and they

don't have the stringent safety standards that the Western manufactured aircraft
do.

***

Q:    Do you think that there is a substantial danger in Third World operators, say, in
      Angola or like countries that the Shahed 278 could be passed off as a Bell 206?

A:    I think – for many reasons, I think that's true.

*Id.* at 44–46.

In the Court's view, this testimony strongly suggests the existence of two markets – a
market for aircraft that meet the exacting certification standards imposed in North America and
Europe, and a Third World market for the less expensive products that do not meet those
standards.  And it supports the notion that the counterfeit items could be passed off as Bell's, but
not necessarily in the United States.

Albert's testimony then turned to the issue of helicopter parts:

A:    . . . Because safety being my main concern in aviation, it leads to the introduction
      of what we refer to as bogus parts.

      *If an operator in a Third World country* that's not regulated like the FAA or the
      CAA looks after them *can go find a less expensive part at a different source that
      fits, they can obviously get them and use them,* even though that part may not be
      certified to the standard that Bell's parts are certified to.

      Also, vice versa; they *could* take a Bell part and put them on that aircraft, *and*
      consequently, if it's not maintained properly and fails, then it puts liability on Bell
      from the reverse standpoint.  So there's a major safety issue and competitive issue
      in having look-alike aircraft in a market that can serve both the East and the West.

*Id.* at 46–47 (emphasis added).  Even if this testimony supports the existence of a world-wide
market – at least for parts – and it reveals the effect that the existence of counterfeit aircraft could
have on that market and on Bell's reputation, it does not establish a direct effect because any
effect felt in the United States is necessarily dependent on a series of intervening acts by others:

the operators who can and do use the parts interchangeably, the sources who sell them, and the customers who fail to maintain their aircraft properly.

Albert also testified:

> Q:    As a consumer of Bell products, in your estimation, do you believe that, particularly, in Africa and the Middle East, that countries that Bell can sell to may buy an Iranian version of it simply because it looks like a Bell product?

> A:    I would think, yes, that they would buy it because it looks alike and because they would expect similar performance.

*Id.* at 48.

This testimony does not even establish that Third World countries do buy Bell helicopters; it simply states that the "countries that Bell *can* sell to" *might* buy the Iranian version of the aircraft based on its appearance.  But Albert's prior testimony suggested that those countries do not buy the more expensive, certified aircraft in the first place; they tend to buy the less expensive products from the Eastern Block.  And even if the Court assumes that Third World countries are potential customers of Bell helicopters, this effect requires a chain of events involving a series of independent third party actors, including Third World operators, who have to intend to buy what they believe are Bell products and not the cheaper products, and then go on and actually purchase the Shaheds by mistake.  The presence of the independent actors in this chain reinforces the conclusion that any effect is indirect, and not direct.

Plaintiffs' final witness was Terry Jeffcoat, the manager of spare part sales at Bell.  *Id.* at 49.  He testified that a helicopter is "refurbished several times throughout its life," *id.* at 50, and that replacement part sales are a "major source of revenue for Bell Helicopter," *id.* at 51.  He testified:

> Q:    And if a fake Bell Helicopter, shall we say, a substitute Bell helicopter enters the market, is that a helicopter that will displace Bell's ability to sell spare parts?

A:      Certainly.

Q:      Bell, for example, wouldn't sell spare parts for a Shahed 278 even if they were identical?

A:      Not knowingly.

*Id.* at 51.

The witness also addressed the lost profit that results from counterfeit products:

Q:      So is it fair to say for every Bell product that's displaced in the market by a copy, whether it's commercial or a military copy, Bell would lose not only, of course, the sale, but also a significant amount in profit?

A:      That's true.

Q:      And how much profit per unit?

A:      Two-thirds.

Q:      And that would be the $500,000 number you indicated?

A:      Yes, sir.

[Q]:      That's profit in spare parts; is that what you mean?

A:      Yes, sir.

*Id.* at 52.  Again, this testimony speaks to purely financial loss, and it turns on the necessary step of someone buying one of the infringing helicopters instead of a Bell Helicopter.  Finally, Jeffcoat addressed the various ways that counterfeit parts enter the market and affect Bell's sales or reputation, but each assertion involves some other actor and begins with the conditional word "if."  *Id.* at 52–54.  Because each statement is dependent on the intervening acts of a series of third parties before Bell feels the effect, it is not direct.  For example, the witness testified:

Q:      And *if* bogus parts enter the Western fleet made by the Iranians, does that create a safety problem for Bell, for existing genuine Bell products?

A:      It could *if* the parts are interchangeable.

23

Q:      And *if* Iranian versions of our product, of Bell's product, have a poor safety record, is that going to reflect poorly on Bell and on the safety of our product?

A:      Yes.

*Id.* at 54 (emphasis added).

Thus, based on all of the evidence that has been presented in these proceedings, the Court cannot find that plaintiffs have met their burden of establishing that there was an activity that caused a direct effect in the United States.  Therefore, on the record before the Court, defendant has not waived its sovereign immunity, and this Court does not have subject-matter jurisdiction over the claim.[13]

## IV.   CONCLUSION

The Court will grant defendant's motion to vacate [Dkt. #28] and dismiss the default judgment because it is void for lack of subject-matter jurisdiction.  Since the Court has determined that it does not have jurisdiction over the matter, it declines to rule on the other grounds advanced by defendant under Rule 60(b)(1) and (6).  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: September 25, 2012

---

13      Defendant also argues that sovereign immunity has not been waived unless HESA, the instrumentality of Iran that technically manufactured and sold the helicopters, was Iran's agent or acted in concert with Iranian officials to infringe the trademarks at hand.  Def.'s Mem. at 8. However, Bell introduced evidence at the October 5, 2009 hearing that included a video of an Iranian general claiming that the helicopters had "been developed by our own specialists, our own experts" and testimony that HESA was owned by the Ministry of Defense of Iran.  Tr. at 25–26.  The Court need not reach this argument because it finds that the Court lacked jurisdiction because Iran had not waived its sovereign immunity under the FSIA.